[No. G029812. Fourth Dist., Div. Three. June 6, 2002.]

In re JOY M., a Person Coming Under the Juvenile Court Law.
ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and
Respondent, v.
JOSEPH B., Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

\*Under California Rules of Court, rules, 976(b) and 976.1, only the factual and procedural
background, part I of the discussion, and the disposition are certified for publication

## Counsel

Michael D. Randall, under appointment by the Court of Appeal, for Defendant and Appellant.

Benjamin P. de Mayo, County Counsel, and Julie Agin, Deputy County Counsel, for Plaintiff and Respondent.

Jacquelyn E. Gentry, under appointment by the Court of Appeal, for Minor.

## Opinion

**O'LEARY, J.**—Joseph B.[1] appeals the juvenile court's jurisdiction and disposition orders regarding his daughter, Joy M., contending: (1) the court improperly relied on a psychological evaluation report to deny family reunification services; (2) the court otherwise erred by denying such services; (3) the court should have allowed monitored telephone visitation between Joseph and Joy; and (4) insufficient evidence supported one of the grounds for the court's jurisdictional finding. We affirm.

Joseph had a long history of paranoid schizophrenia, but his stepmother claimed he did "wonderfully" when he complied with his treatment. Joy's mother, who had a history of mental illness and hospitalizations, disappeared when Joy was a baby. Cynthia B. became Joy's babysitter, and within a short time she began to date Joseph. They eventually married, and the marriage lasted about seven years.

---

[1] In a related writ proceeding (*Joe B. v. Superior Court* (2002) 99 Cal.App.4th. 23 [120 Cal.Rptr.2d 722]), Joseph's attorney informed us Joseph's true first name is Joe. At the attorney's request, we amended the writ petition to reflect the true name. We refer to him in this opinion as "Joseph" because that is the name used in the pleadings in the juvenile court.

The marriage was strained by Joseph's mental illness, failure to take his medication regularly, drug and alcohol abuse, and sudden rages and domestic violence. Before the couple separated, Joseph's inappropriate behavior increased, including the throwing and breaking of objects and assaultive behavior toward Joy and Cynthia. In a reported incident in 1998, Joseph kicked and pinched Joy.

Cynthia separated from Joseph in August 2000, and they divorced in December. Joseph had custody of Joy, but Cynthia had visitation every Wednesday and every other weekend. Things did not go well from there. Joy was unkempt and dirty and complained she was often hungry.

A child abuse report was filed against Joseph three weeks after he and Cynthia separated. It contained allegations Joseph neglected Joy and struck her on the head and shoulders. The report was deemed inconclusive, however. Another report, filed in November 2000, substantiated claims of neglect and minor battery. Joseph claimed at the time that the television was evil and talked to him.

A third report indicated Joseph's condition was deteriorating and he was in denial about his mental illness. He was not taking his medication and was drinking. The social worker observed increasing risk and noted Joy basically cared for herself.

The incident leading to dependency proceedings occurred in May 2001. When Cynthia arrived to pick up Joy for a Wednesday visit, Joseph became especially violent. He screamed and engaged Cynthia in a scuffle. Joy was sandwiched between them, and when Joseph pushed Cynthia off the porch, both she and Joy fell. Joseph began hitting Cynthia but was stopped by a neighbor.

When the police arrived, Joseph told them he had never been married and he did not know Cynthia. He claimed, in essence, Cynthia had tried to kidnap Joy. He was arrested and charged with inflicting injury on a child and cruelty to a child.

Joy said she was always afraid of her dad and he was mean, yelled at her, and called her names. She indicated Joseph had not been taking his medication regularly and she was often hungry.

Joy was released to Cynthia, whom she called "mom." Joseph was in custody at the detention hearing and remained in jail or involuntarily hospitalized during most of the dependency proceedings.[2] A social worker interviewed him at the jail in June, and although he denied suffering from mental illness and claimed he regularly took his medications, he spoke in incomplete sentences and used meaningless words.

Joseph's jail psychiatric case manager reported he was unstable and uncooperative and avoided treatment. He was suffering from delusions and the staff was unsure whether he was swallowing his medication. At the detention hearing, the social worker requested psychological evaluations to determine Joseph's functional level, but that request was denied after Joseph objected. In her jurisdiction/disposition report in late June, the social worker again requested the evaluations, specifying they were necessary to determine whether Joseph could benefit from reunification services.

While he was out of custody awaiting the jurisdiction hearing, Joseph was uncooperative with his care coordinator at the county mental health department. He refused psychiatric treatment, including medication and therapy. He was not functional at all, seeming angry and depressed over losing custody of Joy. The care coordinator believed Joseph needed hospitalization and a conservator.

Joseph's former psychiatrist told the social worker Joseph is clearly psychotic and disorganized. He treated Joseph for six to nine months sometime before Joy was taken from him. Joseph apparently cooperated with the treatment program then, but the psychiatrist had not seen him recently. The psychiatrist opined that if Joseph was refusing medication and was secluding himself in his residence, he would not benefit from reunification services, and it might not be safe to have Joy reside with him.

While the jurisdiction hearing was pending, Joy said she did not want to return to her father and never wanted to see him again. Joy initially indicated she might be willing to speak with him on the telephone but later refused to do so. She was happy and doing well in Cynthia's care.

At the jurisdiction hearing in mid-August, Joseph submitted the case on the social worker's reports. The court struck allegations of drug and alcohol use but otherwise sustained the petition. The petition contained allegations Joseph suffered from an unresolved mental illness, his ability to care for Joy

---

[2]Joseph was released from jail in late June but was rearrested in early August when he failed to appear in court. He was hospitalized immediately when he was again released from jail in late August.

was impaired, Joy was exposed to domestic violence in the home, and Joseph remained incarcerated in the jail's psychiatric unit.

The Orange County Social Services Agency (SSA) again asked the court to appoint two mental health care professionals to evaluate whether Joseph would benefit from reunification services and asked for a 30-day continuance to facilitate the reports. Joseph's attorney objected to the appointment and objected to the continuance, saying Joseph had not been given notice SSA would seek to deny reunification services on the ground he was mentally disabled.

Counsel for SSA noted the social worker's June report contained a recommendation for evaluations for that purpose, and the court ordered two professionals qualified under the Family Code to be appointed to evaluate whether Joseph would benefit from reunification services. It continued the hearing for one month.

A psychiatrist and a psychologist were appointed to do the written evaluations. The psychiatrist reported Joseph was being held involuntarily in a psychiatric ward. He was in denial about his mental illness and constantly spat out oral medication, requiring an emergency injection of antipsychotic and antianxiety drugs. His psychotic behaviors were increasing, and he was disorganized, agitated, and hallucinating. Nevertheless, Joseph believed he was the perfect father.

The psychiatrist concluded Joseph's mental illness and antisocial behavior made it likely Joy would be abused and neglected if she were returned to his custody and it was unlikely he would benefit from reunification services within a year. The psychiatrist recommended no visitation.

In her report, the psychologist opined Joseph suffered from severely disabling mental illness and he presently was unable to benefit from reunification services. She concluded he would be a danger to Joy's physical and emotional health until he could be psychiatrically stabilized. She also recommended against visitation.

At the disposition hearing, the court accepted a social worker's addendum report and the psychiatric reports into evidence without objection. The social worker testified Joy continued to refuse contact with Joseph and noted both evaluations recommended against visitation.

Joseph testified he had no mental health problems and did not think he needed his medications, although he would "probably" take them if released

because otherwise another evaluation might be necessary. Joseph said he had been taking his medications orally and denied receiving any injections. He expressed a willingness to see Joy again but did not know she had refused to see him.

At the end of the hearing, Joseph's counsel argued the evidence was insufficient because the psychologist was not qualified under law to opine whether Joseph would benefit from reunification services. The court disagreed, declared Joy a dependent child, took legal custody from Joseph, and denied reunification services. The court ordered no visits between Joseph and Joy pending a six-month review hearing based on the evaluator's recommendations but authorized SSA to allow visits if Joy's therapist believed it would be in her best interests.

I

Joseph argues the evidence was insufficient to deny reunification services because the court improperly relied on the psychologist's report when nothing in the record showed she was qualified to render her opinion. He forfeited that claim by failing to object to the report at trial.

Welfare and Institutions Code section 361.5, subdivision (b)[3] specifies when a court may deny reunification services. It provides in relevant part: "Reunification services need not be provided . . . when the court finds, by clear and convincing evidence, any of the following: [¶] . . . [¶] (2) That the parent or guardian is suffering from a mental disability that is described in Chapter 2 (commencing with Section 7820) of Part 4 of Division 12 of the Family Code and that renders him or her incapable of utilizing those services."

Subdivision (c) of section 361.5 speaks to the proof required under subdivision (b)(2) and provides in relevant part: "When it is alleged . . . that the parent is incapable of utilizing services due to mental disability, the court shall order reunification services unless competent evidence from mental health professionals establishes that, even with the provision of services, the parent is unlikely to be capable of adequately caring for the child . . . ."

As relevant, Family Code section 7827, which is a part of the Family Code chapter referenced in section 361.5, reads: "(a) 'Mentally disabled' as used in this section means that a parent or parents suffer a mental incapacity or disorder that renders the parent or parents unable to care for and control

---

[3]All further statutory references are to the Welfare and Institutions Code unless otherwise noted.

the child adequately. [¶] . . . [¶] (c) . . . [T]he evidence of any two experts, each of whom shall be a physician and surgeon, certified either by the American Board of Psychiatry and Neurology or under Section 6750 of the Welfare and Institutions Code, [or] a licensed psychologist who has a doctoral degree in psychology and at least five years of postgraduate experience in the diagnosis and treatment of emotional and mental disorders, is required to support a finding under this section."

Joseph notes section 361.5, subdivision (c) requires "competent evidence from mental health professionals" and Family Code section 7827 provides that to be qualified, an examining psychologist must have a doctoral degree and at least five years of postgraduate experience. Because nothing in the record shows how much experience the examining psychologist had, Joseph concludes her evidence was incompetent and the evidence was insufficient to support the court's finding under section 361.5, subdivision (b).

To address Joseph's claim, we must examine two pertinent cases on this topic, one of which arose in this court. In *In re Catherine S.* (1991) 230 Cal.App.3d 1253, 1257-1258 [281 Cal.Rptr. 746], the Court of Appeal found section 361.5, subdivisions (b)(2) and (c) engrafted the competency requirements for the evaluators contained in Civil Code section 232, subdivision (a)(6), the precursor to Family Code section 7820 et seq. Since one of the psychologists who testified in that case was unquestionably not properly licensed, the court found the evidence was insufficient to support the denial of reunification services. Because the issue was insufficiency of the evidence, the court refused to apply a harmless error analysis. (*In re Catherine S., supra,* 230 Cal.App.3d at pp. 1257-1258.)

In *In re Jennilee T.* (1992) 3 Cal.App.4th 212, 222-223 [4 Cal.Rptr.2d 101], we dealt with a similar situation and distinguished *Catherine S.* We noted that unlike *Catherine S.* where the expert was unquestionably unqualified, nothing in the record in *Jennilee T.* showed either of the experts were unqualified. Indeed, affirmative evidence showed they were. (*In re Jennilee T., supra,* 3 Cal.App.4th at pp. 222-223.)

This case is unlike *In re Jennilee T.* and *Catherine S.* There was no evidence the examining psychologist was clearly unqualified, as in *Catherine S.,* but nothing showed she was qualified, as in *Jennilee T.* The record is a blank on that point.

If proof of the examiner's qualifications is an affirmative element of proof, the evidence was insufficient, and Joseph had no need to object to raise the issue on appeal. (See *Martin v. Hall* (1971) 20 Cal.App.3d 414, 421

[97 Cal.Rptr. 730, 53 A.L.R.3d 719] [not necessary to raise sufficiency issue in trial court].) On the other hand, if the examiner's qualifications relate solely to the issue of competency of the examiner's evidence on the issue of mental disability or propriety of unification services, failure to object to the evidence at trial forfeits the issue on appeal. (*In re Tracy Z.* (1987) 195 Cal.App.3d 107, 113 [240 Cal.Rptr. 445] [judgment based on incompetent evidence may be affirmed if no objection was lodged in trial court]; accord, *In re Se. T.* (2002) 95 Cal.App.4th 168, 176, fn. 25 [115 Cal.Rptr. 335].)

Section 361.5, subdivision (c) requires "competent evidence from mental health professionals" to support the denial of reunification services. Family Code section 7827, subdivision (c) specifies "evidence of any two experts [with specified minimum qualifications] is required to support a finding [of mental disability] under this section." Does this language engraft an additional element onto the proof required to show a mental disability that will justify denial of reunification services? No.

Testimony by medical professionals relating to mental disability is indisputably expert testimony. To testify as an expert, a witness must possess adequate knowledge, training, and experience. But to challenge a witness on the ground of inadequate qualifications, the opponent of the testimony must lodge an objection, and the trial court determines the witness's competency as a preliminary fact. (Evid. Code, § 720, subd. (a); see also *People v. Flores* (1992) 7 Cal.App.4th 1350, 1359-1360 [9 Cal.Rptr.2d 754] [claim that witness lacked necessary expertise was forfeited due to lack of objection].)

These long-standing rules establish that a proffered expert's competency is not an element of proof relating to the merits. We must consider whether the Legislature intended to change these rules as they relate to dependency matters when it enacted section 361.5 and Family Code section 7827.

Neither section expressly makes the examiner's qualifications an element of proof. The sections merely require evidence from competent experts and Family Code section 7827, subdivision (c) states what minimum qualifications render an expert competent. The statutory language does not suggest the proponent of the evidence must submit affirmative proof of the qualifications. Thus, nothing in the statutes compels the conclusion the Legislature intended to upset the traditional rules requiring a challenge to an expert's competency to be made by an affirmative objection.

This reading makes sense. As we see from this case, the court maintains a list of competent examiners. It expressly ordered that qualified experts be appointed. Indeed, if we did not find Joseph forfeited his attack on the

expert's qualifications, we could find the court's express order had been properly executed, providing evidence both examiners were properly qualified. (Evid. Code, § 664 [presumption official duty has been regularly performed]; *Estate of Crabtree* (1992) 4 Cal.App.4th 1119, 1125 [6 Cal.Rptr.2d 224] [presumption applies to court clerks].) We have no reason to believe placing the onus on the party opponent to object to the proffered expert evidence will result in the admission of incompetent expert opinion.

■ Joseph asserts that if an objection was necessary, he objected adequately to preserve the issue. His attorney failed to object, however, when SSA offered the reports into evidence. When cross-examining the social worker, the attorney asked whether she knew how much experience the psychologist had, and the social worker said she did not know. Joseph's attorney made no objection to the report at this juncture.

When arguing the case after the evidence was in, the attorney urged, "I would submit [SSA] has not met its burden. I know the court articulated that it believes to become a member of [an expert] panel, a psychologist has to ascertain [*sic*] certain standards, but I am not aware of that evidence being before the court now. [¶] . . . [¶] [M]y position is simply that the Family Law Code 7827 (C) [*sic*] requires that the psychologist have five years' [*sic*] postgraduate experience in treating and diagnosing mental or emotional disorders, and . . . there is no evidence of that before the court so under the circumstances, the court is compelled to order services to [Joseph]."

Although Joseph and SSA characterize these statements as an objection, we have our doubts. It reads much more like an argument that the evidence was insufficient, an argument based on the incorrect assumption SSA had the burden to prove the psychologist's qualifications as an element of its case.

Even assuming it was somehow an objection to, or a motion to strike, the psychologist's report, it was insufficient. Evidence Code section 353 provides in relevant part: "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless . . . [t]here appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion." " '[T]he objection must be made in such a way as to alert the trial court to the nature of the anticipated evidence and the basis on which exclusion is sought, and to afford the [party opponent] an opportunity to establish its admissibility.' [Citation.]" (*People v. Hayes* (1999) 21 Cal.4th 1211, 1261 [91 Cal.Rptr.2d 211, 989 P.2d 645].)

Joseph's "objection" failed the requirements of Evidence Code section 353 on two counts: It was untimely and did not adequately alert the court Joseph sought to exclude the psychologist's report. As to the first point, an objection could have been lodged when the psychologist's report was admitted into evidence. Joseph's attorney did not say anything at the time and did not comment on the matter until all of the evidence was in. At that point, SSA was effectively precluded from presenting evidence that the psychologist had the requisite qualifications. (See *Pineda v. Los Angeles Turf Club, Inc.* (1980) 112 Cal.App.3d 53, 61 [169 Cal.Rptr. 66] [point forfeited on appeal where party objected long after witness testified; earlier objection would have allowed problem to be easily corrected].) At the very least, counsel should have made a motion to strike the report when it became clear the social worker did not know whether the psychologist was qualified. (See *People v. Szeto* (1981) 29 Cal.3d 20, 32 [171 Cal.Rptr. 652, 623 P.2d 213] [motion to strike should have been raised when problem with testimony was revealed on cross-examination].)

Beyond untimeliness, the objection—if it was that—lacked clarity and specificity. Joseph's attorney conveyed his belief evidence of the psychologist's qualifications was needed, but he gave no clue he wanted the evaluation excluded. Under these circumstances, SSA had no opportunity to evaluate the potential impact of an objection regarding the psychologist's qualifications on the evidence it had presented. (See *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1120-1121 [36 Cal.Rptr.2d 235, 885 P.2d 1] [later generalized objection was insufficient to preserve claim of error regarding earlier specific evidence].)

Joseph argues his due process rights were violated because he had "no notice the case would take such a departure from the 'specific directions' of [Family Code section 7827]." He cites no authority, and we are aware of none, for the proposition his failure to appreciate the need to object constitutes a lack of adequate notice.

Joseph contends the trial court improperly took judicial notice of its list of qualified experts to find the necessary proof had been made. We do not read the court's brief comments about its experts list to be a taking of judicial notice. Even if it were, however, it would be irrelevant because we have concluded proof of the qualifications was unnecessary in the absence of an objection. The trial court properly considered the psychologist's report when it denied reunification services.[4]

---

[4]Because we find the challenge to the psychologist's qualifications was forfeited, we deny SSA's request for us to take evidence on appeal.

## II-IV*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

The jurisdiction and disposition orders are affirmed.[5]

Sills, P. J., and Bedsworth, J., concurred.

---

*See footnote, *ante*, page 11.

[5]In a footnote, Joseph argues he received inadequate notice SSA would seek to deny him reunification services under section 361.5. We are not fond of footnote arguments, as they make us unsure whether the appellant is attempting to raise a ground on appeal or is merely making a passing comment. Out of an abundance of caution, we will assume it is the former and will address it briefly: SSA gave Joseph notice of an intent to proceed under section 361.5 in its June 27 report. It reinforced that intent at a hearing in mid-August. The hearing on reunification services did not occur for another month. Notice was adequate.